The judgment of the court was pronounced by
Preston, J.
On the 11th of November, 1848, Horace R. Buck brought suit in the Third District Court against Oliver C. Henry for $1065 56 with interest. The same day Henry confessed judgment. Three slaves, named Hester, Clarissa and William, were seized under an execution issued, and were about to be sold in three days after the rendition of the judgment. M. O. Hopkins, as guardian of two minor daughters of Henry, enjoined the sale, alleging that the slaves belonged to them
The judgment against Henry was rendered on a judgment obtained by Buck against him in the State of Mississippi, in April, 1848. The suit in that State was commenced in September, 1846, on a note dated at Port Gibson the 17th of August, 1835, for $540, drawn by A. C. Henry and Martin O. Hopkins, in favor of and endorsed by John Grissam. Execution on the judgment was levied in May, 1848, on two of the slaves, William and Clara, in the possession of M. O. Hopkins, to whom they were soon restored, and nothing was made on the execution.
*488 Besides this record, Bucle offered in support of his seizure a bill of sale from William A. Buck to Oliver C. Henry of the three slaves, purporting to be dated the 17th of August, 1835, but it is proved by the apparent vendor that it was really executed in 1848. On this document we do not think the remark of the district judge too severe, that it “is a fraudulent fabrication of evidence, the unavoidable effect of which is, to involve the defendant’s whole case in suspicion.”
Parties capable of offering a fictitious bill of sale, antedated thirteen years, in support of their claims, may well be suspected of having colluded as to a judgment in the State of Mississippi, rendered on a promissory note upon which suit was not brought until ten years after its maturity. Besides, the fact that the note at the commencement of the suit was barred by the statute of limitations, there are other suspicious circumstances. There was an endorser; it does not appear to have been protested. There was a joint drawer: the very Hopkins who has obtained this injunction; it was not prosecuted against him. It was a note for only $540, given as the balance of the price of three slaves, all living to this day. It is incredible almost, that it should have remained unpaid, or any part even of the interest, and that no steps should have been taken for its collection for ten years.
But even if we suppose the note unpaid, it was extinct as to third persons by the statute of limitations. The children of Henry are third persons as to him, when their interests are adverse, and as to their separate property. As to them, therefore, Buck ceased to be a creditor of thoir father Henry, six years after the maturity of his note, that is, iu_1842.
Now, by Buck’s own testimony it appears, that he sold the slaves and made a bill of sale, at the request of Henry, to his daughters, in 1835. There is much corroborating testimony. The vendor, Buck, and Henry both informed the witness I-Iopkins that the slaves were the property of Mary and Minerva Henry; that the conveyance had been made to them by Buck, and that the vendor had received satisfaction in a negro and negotiable paper. The negroes have always been reputed, in the family of Henry and the neighborhood, as the slaves of those children. Henry and wife having separated, he gave up the slaves as part of the property of his family. They'were not brought from the State of Mississippi by force, but to prevent Henry from decoying them off, as he attempted to do with regard to several negroes belonging to the children by the will of their grand-father.
Bohan, once a deputy sheriff in Mississippi, believes two of the slaves belonged to Henry’s children; because, having levied upon them, they were replevied by Hopkins, guardian of the children; and moreover he heard Buck say that he had made a bill of sale of them to Henry’s children.
The return of the sheriff on the execution in the State of Mississippi, is conclusive aá to the legality of Hopkin’s possession for the children in this State. He returns, that “The negro slaves levied on in this case was this day restored to the possession of M. O. Hopkins, from whom they were taken, because bond of indemnity was not given as was required by a notice given on the 17th day of May, 1848. June 5th, 1848. R. M. Moore, Sheriff.” This document, offered in evidence by Buck, shows that the possession of Hopkins was not, as he alleges, obtained by crime and preserved by concealment. Indeed the testimony of Borland and other witnesses relied upon by the defendant, shows nothing against Hopkins but the exercise of that determination and firmness usually practiced by men on a claim of right.
*489 As to the possession of Henry, while the slaves actually remained with him, it is legally to be considered the possession of his two daughters, of whom he was the natural guardian; because by his own act and request the title was conveyed to them; and possession follows the title.
In the case of Hyde et als. v. Hervy, the Supreme Court held that the purchase by a father, of property in the name of his children, should be valid as to all who were not his creditors at the time of the purchase. Our courts have always adhered to this principle. Holmes v. Patterson, 5 M. R. 693.
Our code, our decisions, morality and good policy require us to discountenance and disregard simulations and fictions in the transactions of men where we can do so without injury to third persons.
The judgment of the district court is affirmed, with costs.